ON MOTION FOR REHEARING
 

 PER CURIAM.
 

 We grant the motion for rehearing filed by the appellants, withdraw our former opinion dated October 28, 2008, and substitute the following opinion in its stead.
 

 Xavier Shuler and the Department of Children and Families (DCF) appeal the final order entered by the trial court placing Shuler’s biological daughter, T.S., with DCF for purposes of adoption. We affirm.
 

 The record reveals that DCF filed a petition seeking shelter care for two-month-old T.S. The petition alleged that violence was occurring within T.S.’s home. The petition explained that T.S. was living with her mother and Shuler, the child’s biological parents, at the time she was taken into DCF custody. The petition also explained that the mother was married but that she and her husband were no longer living together.
 

 At the shelter hearing, T.S.’s mother did not appear; however, her husband appeared and advised the court that he intended to seek a divorce from the mother but that he preferred to maintain his legal rights to T.S. Shuler also appeared at the hearing and he was advised by the court that, notwithstanding the fact that he was T.S.’s biological father, he had no existing legal rights to T.S. since T.S. was born during the course of the mother’s marriage. The court advised Shuler to seek legal advice concerning how he could assert his rights to the child. The court then adjudicated T.S. to be in need of shelter care and placed her in foster care. The court also ordered that Shuler be treated as a participant in the proceedings.
 

 DCF thereafter filed a petition for dependency and for termination of parental rights (TPR). A status hearing was held. Both biological parents appeared at the hearing; however, the mother’s husband did not appear. Since the husband failed to appear, the trial court deemed his action as constituting consent to the TPR petition.
 

 Shuler and several of his relatives filed separate motions to intervene in the TPR proceeding. The trial court then conducted a status hearing. During the hearing, DCF advised the court that the mother had died. Upon review of the evidence presented, the court terminated both of the legal parents’ rights to T.S.; the mother’s based on her death and the legal father’s based on his deemed consent. The court also adjudicated T.S. to be dependent and ordered that she remain in DCF custody.
 

 The trial court later conducted another status hearing. Shuler was present at the hearing and requested the right to pursue custody of T.S. and to obtain DNA testing. Upon review, the trial court ordered T.S. to remain in DCF custody, denied the motions to intervene filed by Shuler and his family members, denied Shuler’s motion for DNA testing, and advised Shuler that paternity could be pursued by filing a separate paternity action.
 

 Shuler then filed a petition to determine paternity. The trial court thereafter conducted a Permanency Case Plan Acceptance Hearing. During the hearing, the trial court scheduled a
 
 “Privette
 
 ”
 
 [1]
 
 hear-
 
 *335
 
 mg, ordered that Shuler’s paternity action be “coordinated” with DCF’s pending TPR action, and directed DNA testing to take place.
 

 The Guardian Ad Litem (GAL) subsequently filed a report with the court which recommended keeping T.S. in her current placement and ordering Shuler to pay child support. The General Magistrate meanwhile advised the court that the DNA test results established Shuler’s paternity of T.S.
 

 After conducting another status hearing, the trial court entered an order recognizing the unusual facts of the case, the fact that the parental rights of T.S.’s legal parents had been terminated, that Shuler had exercised visitation with the child, and that a favorable home study had been approved by DCF in relation to Shuler’s home. The court adjudicated Shuler as being T.S.’s biological father and then, expressing the hope that the parties could reach an amicable agreement regarding the custody of the child, ordered the parties to mediation. The parties were unable to reach any agreement at mediation.
 

 The GAL then filed a second report recommending that T.S. be placed for adoption.
 

 The trial court conducted a hearing on the pending issues relating to T.S.’s placement. Upon review of the evidence presented by the parties, the trial court entered an order placing T.S. with DCF for purposes of adoption and dismissing Shu-ler’s paternity petition. This appeal timely followed.
 

 Shuler and DCF both argue that the trial court reversibly erred, as a matter of law, in denying Shuler’s paternity petition and directing T.S. to remain in DCF care for the purpose of adoption. We disagree. Under the facts of this case, the trial court was constrained under Florida law to place T.S. with DCF for adoption.
 

 A man who fathers a child with a woman who is married to another man generally has no parental rights or responsibilities to the child. As described by the United States Supreme Court in
 
 Michael H. v. Gerald D.,
 
 491 U.S. 110, 127, fn. 6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989):
 

 If, for example, there were no societal tradition, either way, regarding the rights of the natural father of a child adulterously conceived, we would have to consult, and (if possible) reason from, the traditions regarding natural fathers in general. But there is such a more specific tradition, and it unqualifiedly denies protection to such a parent.
 

 Under Florida’s common law, such men can acquire parental rights and responsibilities through a judgment of paternity; however, that remedy is narrow.
 
 See G.F.C. v. S.G.,
 
 686 So.2d 1382, 1386 (Fla. 5th DCA 1997). Although some suggest that the common law rule has been altered,
 
 [2]
 
 this much has remained clear as to the biological father of a child born during the course of the mother’s intact marriage: The mother’s husband is the child’s legal father unless and until a court effects the substitution.
 
 See S.D. v. A.G.,
 
 764 So.2d 807 (Fla. 2d DCA 2000);
 
 Achumba v. Neustein,
 
 793 So.2d 1013 (Fla.
 
 *336
 
 5th DCA 2001);
 
 I.A. v. H.H.,
 
 710 So.2d 162 (Fla. 2d DCA 1998).
 

 In this case, the trial court properly advised Shuler that, under Florida law, he had no legally recognized parental relationship to T.S., therefore, he could not intervene in the TPR proceeding. Shuler was further advised that he could seek to assert a claim regarding the child by filing a paternity action. Despite receiving such advice, Shuler waited several months, until after the parental rights of both legal parents had been terminated, to file a paternity action. As the trial court’s order makes clear, although Shuler has a finding of fact that he is T.S.’s biological father, this gained him nothing because, as the biological father of a child who was born during the mother’s intact marriage, he has no legal rights.
 

 Under section 39.811(2), of the Florida Statutes (2007), the trial court was required to decide whether to terminate the parental rights of the mother and the legal father. The statute plainly contemplates that, once the parental rights of the legal parents are terminated, the child is to be placed in DCF custody for the purpose of adoption. The statute does not contemplate that a child who becomes adoptable when his or her legal parents’ parental rights have been terminated, can somehow become unadoptable when someone else then claims to be the child’s biological father.
 

 In issuing our ruling we recognize that if a man who impregnates a married woman were permitted to assert a claim to the child after the legal parents’ parental rights were terminated, that claim would be open-ended perhaps leaving children who might otherwise be adopted without families.
 

 Accordingly, the trial court was correct in dismissing Shuler’s paternity petition. Shuler can seek to adopt T.S. and, as the biological father he may have some advantage, but he has no “parental rights.”
 

 AFFIRMED.
 

 GRIFFIN, PALMER, and LAWSON, JJ., concur.
 

 [1]
 

 .
 
 See Dep 't of Health & Rehabilitative Services v. Privette,
 
 617 So.2d 305 (Fla.1993)(holding that once children are born legitimate, they have a right to maintain that status both fac
 
 *335
 
 tually and legally if doing so is in their best interests).
 

 [2]
 

 . Chris W. Altenbernd,
 
 Quasi-Marital Children: The Common Law’s Failure in Privette and Daniel Calls for Statutory Refonn,
 
 26 Fla. St. U.L.Rev. 219 (1999). Judge Altenbernd refers to the children of such relationships as "quasi-marital.” Based on decisions of the Florida Supreme Court involving efforts by mothers to obtain support for quasi-marital children, he characterizes the current state of the law as "inconsistent and confusing.”
 
 Id.
 
 at 239.