Gross, J.
We affirm the denial of M.L.’s motion to intervene in the mother’s termination of parental rights proceeding. We write to explain that while a biological father who is a stranger to an existing marriage into which a child is born is not wholly without rights, he must demonstrate an enduring commitment to being a full-time parent, and do so expeditiously, in order to avail himself of those rights. Where he fails to act with such expediency, and displays only a casual interest in fatherhood, a trial court does not abuse its discretion by denying a potential biological father’s motion to intervene in the legal parents’, termination proceedings.
The child, J.L., was sheltered on January 30, 2015, when he was just 6-days-old, after he tested positive for cocaine and was undergoing withdrawal symptoms. At the shelter hearing, the trial Court was advised that, although the mother was married to the husband at- the time of the child’s birth, the mother identified M.L. as the biological father. .M.L. was also listed as the father on the-child’s, birth certificate. The Department of Children and Families (“DCF”) advised the court that the husband stated he had “no interest in this child." Because the mother and. husband were married at the time of- the child’s birth, the trial court .ruled that the hus *144 band was the father “in the eyes of the law.”
Court notes from a February 26, 2015 hearing indicate that the mother, husband, and prospective biological father were all in attendance. Disestablishment proceedings were in progress for the husband, who wanted a DNA test. The record also shows that, by July 9, 2015, the prospective biological father had been advised on how to establish paternity and the husband had been advised on how to disestablish paternity.
On June 23, 2016, DCF filed a petition to terminate the parental rights of the mother and husband. The foster parents, with whom the child had been placed for half of his life, informed DCF that they were willing to adopt the child.
On September 19, 2016, the prospective biological father filed an emergency motion to intervene and stay any TPR or adoption proceedings until he had an opportunity to be heard. The prospective biological father alleged that he was the child’s biological father and was present at the child’s birth. Attached to the motion was the prospective biological father’s “petition to determine paternity and related relief’ filed on July 28, 2016, which was pending before a different judge. He also attached a notice of acknowledgment from the Florida Department of Health of his registration with the Florida Putative Father Registry submitted on July 28, 2016.
At the hearing on the motion, counsel for the prospective biological father explained that, once she realized there was a pending dependency case, she sought a way to get her client involved, because the prospective biological father “had been left out of the case essentially because the parties were married.” She requested the court allow the prospective biological father to be “a part of this case.”
The court understood the prospective biological father’s “sympathetic” position, but explained that, “under the current state of the law, if a child is born into an intact marriage, that husband is the child’s father for all intents and purposes in the eyes of the law regardless of who the biological father may be.” The court noted the more “frustrating” aspect of the case was that the husband was present and ready “to have his rights terminated as to the child.” Nevertheless, the court explained that, before the prospective biological father could establish his paternity, the husband had to disestablish his paternity. The court advised counsel that her client was “basically at the mercy of [the husband’s] whim.”
The TPR trial was continued until November 7, 2016 due to the mother’s hospitalization. The court advised the parties that if there was any work they wanted to do on the case to get it done before November 7.
Significantly, the prospective biological father’s petition to establish paternity was stayed “to avoid potentially duplicative or inconsistent court orders.” The order entering the stay was not challenged in this court.
On November 3, 2016, the prospective biological father filed an “urgent amended motion to intervene.” He alleged that he “has had a relationship with his son since birth and he believes it is in the child’s best interests to be with him so that he can raise him.” The prospective biological father attached a photo of him with the child as well as a certificate of completion of a DCF-approved parenting class. He also filed the husband’s affidavit “to disestablish paternity,” wherein the husband swore that, even though he was still legally married to the mother at the time of conception, “they had been physically separated for approximately 6 years or more,” *145 and it was thus “physically impossible” that the child was his.
The court heard the motion to intervene before the TPR trial. Finding that section 742.18, Florida Statutes (2016)—which outlines the procedure for disestablishing one’s paternity—had not been complied with because there still had been no DNA testing, the court denied the motion to intervene. The court went forward with the mother’s TPR trial, and subsequently entered a final judgment terminating the parental rights of both the mother and' husband.
We begin by holding that the trial court did not abuse its discretion in denying the prospective biological father’s motion to intervene because of the year and a half delay in attempting to establish his paternity. Because he had not established his paternity, “under Florida law, he had no legally recognized parental relationship” to the child and thus “could not intervene in the TPR proceeding.” Shuler v. Guardian Ad Litem Program, 17 So.3d 333, 336 (Fla. 5th DCA 2009); see also Fla. R. Juv. P, 8.226(5) (“If the court has identified both parents of a ehild as defined by law, the court shall not recognize an alleged biological parent as a parent in the proceeding until a court enters an order pursuant to law establishing the alleged biological parent as a parent in the proceeding.”) (emphasis added). The trial court correctly identified the husband as the child’s legal father because, even though the mother and husband had been physically separated for years, “[a] child born during marriage is presumed to be the child of both the husband and wife.” Fla. Dep’t of Revenue v. Cummings, 930 So.2d 604, 607 (Fla. 2006).
We write to clarify that, while a biological father who is a stranger to an existing marriage into which a child is born has extremely limited rights, his ability to establish his paternity is not left entirely to the husband’s “whim.”
It is generally true “that a putative father has no right to seek to establish paternity of a child who was born into an intact marriage when the married woman and her husband object.” Lohman v. Carnahan, 963 So.2d 985, 987 (Fla. 4th DCA 2007) (quoting Johnson v. Ruby, 771 So.2d 1275, 1275-76 (Fla. 4th DCA 2000)). However, a biological father may seek to establish his paternity, eveh when both the mother and husband object, if “common sense and reason are outraged” by applying the marital presumption to bar such an action. Lander v. Smith, 906 So.2d 1130, 1133 (Fla. 4th DCA 2005) (quoting Dep’t of Health & Rehab. Servs. v. Privette, 617 So.2d 305, 309 (Fla. 1993)). A biological father may also seek "to establish his paternity where “both the mother and the legal father have surrendered their rights to the child.” J.T.J. v. N.H., 84 So.3d 1176, 1180" (Fla. 4th DCA 2012) (emphasis in original).
In J.T.J., the child was immediately placed in DCF’s custody because he tested positive for marijuana and cocaine at birth. Id. at 1177. The mother was married at the time of birth, but the husband’s name was not put on .the birth certificate. Id. Both the mother and husband signed a surrender of their parental rights. Id. DCF’s case plan for the child identified a biological father and stated that.it was conducting a diligent search for him. Id. Several months later, the biological father filed a verified petition to determine paternity, alleging that he was the child’s biological father “and that a DNA test positively identified him as such.” Id. at 1178. This court reversed the trial court’s dismissal of the petition, noting that only the biological father desired to be a parent to the child and DCF did not contest the paternity proceedings. Id. at 1180.
*146 Thus, the trial court’s belief that the prospective biological father had no rights unless and until the husband disestablished his paternity was not correct. However, the problem for the prospective biological father, and the • main distinction between this case and J.T.J., is that he did not act quickly enough. In J.T.J., at the time the biological father petitioned for paternity, DOF had not filed a TPR petition. Id. at 1178. Additionally, the biological father in J.T.J. alleged in his petition that “a DNA test positively identified him as such,” and that he had been working with DCF and GAL, had prepared a home for the child, participated in a DCF home visit, and was establishing a relationship with the child. Id.
Here, the prospective biological father waited a year and a half to establish his paternity, until after DCF filed its termination petition, and he still did not havé DNA confirmation that he was the child’s biological father. It cannot be said that he was not on notice of the child’s existence or DCF’s involvement, as the record reflects he was present for an advisory hearing on February 26, 2015; by July 9, 2015, he had been advised on how to establish paternity. In essence, the prospective biological father was asking the trial court to delay the ongoing termination proceedings when it was entirely possible that he was not the child’s biological father.
Moreover, although the prospective biological father alleged that he had developed a relationship with the child, having a relationship is not the same as demonstrating a full commitment to the responsibility of being a parent. Only where "an unwed [biological] father demonstrates a full commitment to the responsibilities of parenthood by coming' forward to participate in raising his child,” does the constitutional protection of the individual’s right to be a parent apply to a biological father, D.M.T. v. T.M.H., 129 So.3d 320, 335 (Fla. 2013); see also Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (explaining that, “the mere existence of a biological link does not merit equivalent constitutional protection”). The foster parents in this case demonstrated the requisite commitment to being full-time parents, even in the absence of a biological connection to the child.
Here, the prospective biological father needed to act with more expediency. The Florida Legislature has stated “that.time is of the essence” in these cases, and at the time of the prospective biological father’s motion to intervene, the child had spent his entire life in the dependency system. § 39.0136(1), Florida Statutes (2016). He deserved permanency, and the trial-court did not abuse its discretion by not further delaying the proceedings to accommodate a potential biological father. See S.M. v. Fla. Dep’t of Children & Families, 202 So.3d 769, 778 (Fla. 2016) (“The parent’s rights are subject to the overriding princir pie that it is the ultimate welfare and the best interests of the children that must prevail.”).

-Affirmed,-

Ciklin, C.J., and Conner, J., concur.