# Supreme Court of Florida

_____

No. SC17-1963
_____

**TRENEKA SIMMONDS, et al.,**
Petitioners,

vs.

**CONNOR PERKINS,**
Respondent.

[June 28, 2018]

LAWSON, J.

Treneka Simmonds seeks review of the decision of the Fourth District Court of Appeal in *Perkins v. Simmonds*, 227 So. 3d 646 (Fla. 4th DCA 2017), on the ground that it expressly and directly conflicts with a decision of this Court and decisions of other district courts on a question of law. We agree with Simmonds that *Perkins* expressly and directly conflicts with *Slowinski v. Sweeney*, 64 So. 3d 128 (Fla. 1st DCA 2011), and *Tijerino v. Estrella*, 843 So. 2d 984 (Fla. 3d DCA 2003), on the question of whether a biological father is entitled to rebut the common law presumption that the mother's husband is the legal father of a child

born to an intact marriage, where the mother or her husband object to allowing such rebuttal.  Accordingly, we have jurisdiction.  *See* art. V, § 3(b)(3), Fla. Const.

For the reasons explained below, we hold that the biological father has standing to rebut this presumption, known at common law as the "presumption of legitimacy," when he has "manifested a substantial and continuing concern" for the welfare of the child, *Kendrick v. Everheart*, 390 So. 2d 53, 61 (Fla. 1980).  We further hold that the presumption is overcome when there is a "clear and compelling reason based primarily on the child's best interests."  *Dep't of Health & Rehabilitative Servs. v. Privette*, 617 So. 2d 305, 309 (Fla. 1993).  We, therefore, approve the result reached by the Fourth District in *Perkins* as well as the reasoning of that decision to the extent it is consistent with this opinion.  We disapprove the decisions of the First and Third Districts in *Slowinsky* and *Tijerino*.

## FACTS

It is undisputed that the child at the center of this case is the biological daughter of Connor Perkins.[1]  Perkins and the child's mother, Simmonds, engaged in a three-year relationship.  While that relationship was ongoing, Perkins was never informed that Simmonds was married to the man who now asserts his status as the child's legal father by virtue of his marriage to Simmonds.  That man,

---

1. A private DNA test has shown a 99.99% probability that Perkins is the child's biological father.

Shaquan Ferguson, met Perkins on several occasions while Simmonds and Perkins were together, and yet Ferguson was never held out to be Simmonds's husband. At some point, Perkins knew Simmonds was married, but Simmonds told him that she was married for "immigration purposes" only and intended to get a divorce. In the words of the circuit court, when the child was born, Perkins had "no idea that there was an intact marriage."

Perkins was at the hospital for the child's birth. It is undisputed that Ferguson was not and that Simmonds declined to provide Ferguson's name to be listed as the child's father on the birth certificate. Simmonds did, however, give the child Perkins's last name, and she proceeded to raise the child with Perkins. For a period of time, Perkins and Simmonds lived together with the child, and during another period of time, the child lived with Perkins without Simmonds, but with the knowledge and consent of Simmonds. Perkins has taken the child to doctor's visits and enrolled the child in day care. Perkins has also regularly and voluntarily paid child support to Simmonds for the child. The child knows Perkins as "daddy." Perkins has also alleged that the child knows and loves his mother as her grandmother.

## LEGAL BACKGROUND

It was in this factual context that Perkins decided to file a petition in circuit court to establish paternity, child support, and timesharing. Despite the

relationship that had developed between Perkins and the child, Simmonds moved to dismiss the action, arguing that it was barred by the common law presumption of legitimacy because Simmonds was married to Ferguson at the time of the child's birth and remains married to Ferguson. This motion prompted Perkins to name Ferguson as an additional party, amend his petition to add a count seeking the disestablishment of Ferguson's paternity, and allege that it would be in the child's best interests for Perkins to be recognized as her legal father. Like Simmonds, Ferguson moved to dismiss on the basis of the presumption of legitimacy. However, neither Simmonds nor Ferguson disputed that Perkins is the child's biological father.

Although the circuit court held an evidentiary hearing and found that "[t]he facts strongly" indicate that allowing Perkins to have "some involvement in the child's life" would be in the child's best interests, the circuit court ultimately concluded that it was constrained by Fourth District precedent to dismiss the petition as a matter of law. Quoting *Johnson v. Ruby*, 771 So. 2d 1275, 1275-76 (Fla. 4th DCA 2000), the circuit court concluded that "[a] putative father has no right to [seek to] establish paternity of a child who was born into an intact marriage, when the married woman and her husband object." This inflexible rule of law, the circuit court ruled, barred Perkins's action, even though Perkins is the child's biological father, was at the hospital for the child's birth, has been

- 4 -

substantially involved in the child's life since then, and is known to the child as "daddy."

Perkins appealed the dismissal to the Fourth District, which reversed. *Perkins*, 227 So. 3d at 650. The Fourth District acknowledged that the rule the circuit court applied had been stated in its own case law and applied strictly in other districts but concluded that the other districts misapprehended the nature and effect of the presumption of legitimacy. *Id*. at 648. The Fourth District cogently explained the law and the conflict among the district courts as follows:

> The law presumes that the husband of the biological mother of a child is the child's legal father. *J.T.J. v. N.H.*, 84 So. 3d 1176, 1179 (Fla. 4th DCA 2012). " 'This presumption is one of the strongest rebuttable presumptions known to law and is based on the child's interest in legitimacy and the public policy of protecting the welfare of the child.' " *Id.* (quoting *G.T. v. Adoption of A.E.T.*, 725 So. 2d 404, 410 (Fla. 4th DCA 1999)). Because of the strength of this presumption, many courts have held that "a putative father has no right to seek to establish paternity of a child who was born into an intact marriage when the married woman and her husband object." *Johnson v. Ruby*, 771 So. 2d 1275, 1275-76 (Fla. 4th DCA 2000); *see also Tijerino v. Estrella*, 843 So. 2d 984, 985 (Fla. 3d DCA 2003). The facts in *Johnson* did not call for an inquiry into the relationship between the child and the putative father, because in *Johnson* the child was not yet born at the time the putative father filed his petition to establish paternity. *Id.* The First District has gone so far as to suggest that the presumption of legitimacy may never be rebutted. *Slowinski v. Sweeney*, 64 So. 3d 128, 129 (Fla. 1st DCA 2011). This Court, however, has reaffirmed that the presumption of legitimacy afforded to a child born within an intact marriage is exactly that: a ***presumption***. Thus, the presumption of legitimacy may be rebutted in certain, rare circumstances.

*Id.* (footnote omitted).  The Fourth District went on to quote its prior opinion tracking the language of our decision in *Department of Health & Rehabilitative Services v. Privette*, 617 So. 2d at 309, to explain that "[a] biological father may seek to establish his paternity, even when both the mother and husband object, if 'common sense and reason are outraged' by applying the marital presumption to bar such an action" under the particular facts of the case.  *Perkins*, 227 So. 3d at 649 (quoting *M.L. v. Dep't of Children & Families*, 227 So. 3d 142, 145 (Fla. 4th DCA 2017)).  The Fourth District concluded that this was the situation in this case and that the presumption of legitimacy should not be applied to bar this action.  *Id.* at 649-50.  As a result, the Fourth District reversed and remanded for further proceedings.  *Id.* at 650.

## ANALYSIS

To resolve the conflict, we must determine whether the common law presumption of legitimacy creates an absolute bar to an action by a biological father to establish parental rights when the child's mother was married at the time of the child's birth and both she and her husband object to the action.[2]  We agree with the Fourth District that it does not.

---

2. This is a question of law, subject to de novo review.  *See Public Defender, Eleventh Judicial Circuit of Fla. v. State*, 115 So. 3d 261, 282 (Fla. 2013) ("Determining whether a party has standing [under a given set of facts] is a

- 6 -

The presumption of legitimacy has its roots in early common law. *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989); *G.F.C. v. S.G.*, 686 So. 2d 1382, 1384 (Fla. 5th DCA 1997). Although there was a time when the husband was the only person with a recognized cause of action in which to put the presumption at issue, it was always rebuttable in theory. *See Michael H.*, 491 U.S. at 124; *G.F.C.*, 686 So. 2d at 1384-85. Though rebuttable in theory, the presumption was "virtually conclusive" in practice, due to limitations imposed by the rules of evidence and lack of scientific knowledge. *Eldridge v. Eldridge*, 16 So. 2d 163, 164 (Fla. 1944); *see Michael H.*, 491 U.S. at 124; *see also Lohman v. Carnahan*, 963 So. 2d 985, 988 (Fla. 4th DCA 2007) (noting that "the knowledge of paternity acquired by DNA testing" has become a consideration the law must include when balancing the competing interests in this type of case).

As a practical matter, the presumption was typically rebutted, or sought to be rebutted, when a husband did not want to support a child that he believed was not his. *See Gammon v. Cobb*, 335 So. 2d 261, 265 (Fla. 1976); *see also, e.g.*, *Eldridge*, 16 So. 2d at 163-64. The presumption was intentionally very strong, in large part because it was designed to protect children from suffering the stigma of "illegitimacy" and from being left without a father to support them, but also in the

---

pure question of law to be reviewed de novo.") (quoting *Sanchez v. Century Everglades, LLC*, 946 So. 2d 563, 564 (Fla. 3d DCA 2006)).

interest of protecting the peace and sanctity of marriage and families at a time when it was not possible to resolve doubts about paternity with any degree of scientific certainty. *See Eldridge*, 16 So. 2d at 163 (characterizing the presumption as "one of the strongest rebuttable presumptions known to the law"); *Sacks v. Sacks*, 267 So. 2d 73 (Fla. 1972) (opining that to apply the presumption to deny a child financial support would "destroy the very reason for its existence"); *Michael H.*, 491 U.S. at 125 (noting that the primary concern was to protect children's legitimacy so that they could inherit and not become "wards of the state" and that a secondary concern was the "peace and tranquility" of families); *Lohman*, 963 So. 2d at 988 ("For centuries, the law developed on the assumption that a mother's parentage was certain, but a father's connection to a child could be open to doubt.").

The presumption is still part of the common law of this state, as we have never eliminated it and no statute has replaced it. *See Major League Baseball v. Morsani*, 790 So. 2d 1071, 1078 (Fla. 2001) ("[E]ven where the Legislature acts in a particular area, the common law remains in effect in that area unless the statute specifically says otherwise . . . .") (citing *State v. Ashley*, 701 So. 2d 338, 341 (Fla. 1997)). However, we have recognized that someone other than the mother's husband can place the presumption at issue in a proper action, *see Kendrick*, 390 So. 2d at 57-60, and developed the substantive test for rebutting the presumption in

cases where the mother's husband seeks to maintain his status as the child's legal father, *Privette*, 617 So. 2d at 309; *cf. Daniel v. Daniel*, 695 So. 2d 1253, 1255 (Fla. 1997) (declining to apply the *Privette* test in a dissolution of marriage action where the husband raised the issue of paternity, the parties stipulated that the child was not biologically related to the husband, and the husband had never committed to supporting the child).

Specifically, in *Kendrick v. Everheart*, we recognized that the biological father of a married woman's children has the right to bring an action to establish his parental rights as the father as long as he has "manifested a substantial and continuing concern for the welfare of the children." 390 So. 2d at 61; *see also Van Nostrand v. Olivieri*, 427 So. 2d 374, 377 (Fla. 2d DCA 1983) (concluding that *Kendrick* establishes the test for a putative biological father's standing).

Despite this holding in *Kendrick*, district courts have often held that the presumption of legitimacy absolutely blocks a paternity action if the married woman and her husband object. *E.g.*, *J.S. v. S.M.M.*, 67 So. 3d 1231, 1233 (Fla. 2d DCA 2011); *Lohman*, 963 So. 2d at 987; *Tijerino*, 843 So. 2d at 985; *Johnson*, 771 So. 2d at 1275-76; *see also Slowinski*, 64 So. 3d at 129 (stating the rule where the mother was not alive to object); *Bellomo v. Gagliano*, 815 So. 2d 721, 722 (Fla. 5th DCA 2002) (stating and applying this rule while also recognizing a "hypothetical" exception where "a relationship between the putative father and the

- 9 -

child has developed"); *cf. Nevitt v. Bonomo*, 53 So. 3d 1078, 1082-84 (Fla. 1st

DCA 2010) (recognizing the rule but allowing the action to proceed due to

indications, in the district court's view, that the marriage was not "intact"). This

focus on whether the mother and her husband object, by now ubiquitous in the

district court case law, does not originate in this Court's precedent or in the early

common law,[3] but in *S.B. v. D.H.*, 736 So. 2d 766, 767 (Fla. 2d DCA 1999).

Under our precedent, when the mother and her husband object to the establishment

of the biological father's paternity, standing is determined according to the test

stated in *Kendrick*, not according to the mother and her husband's objection or the

applicability of the presumption of legitimacy.

Nevertheless, the presumption of legitimacy is central to the case once

standing is established under the *Kendrick* test. In *Privette*, we reaffirmed the

presumption of legitimacy, explaining that it "is based on the policy of protecting

the welfare of the child, i.e., the policy of advancing the best interests of the child"

and that "[t]his policy is a guiding principle that must inform every action of the

courts in this sensitive legal area." 617 So. 2d at 307 (citing *Sacks*, 267 So. 2d 73).

Indeed, the presumption still serves at least one important function that it served at

---

3. The early common law did not contemplate an action by the biological father at all so as to make the mother and her husband's objection an issue. *See Michael H.*, 491 U.S. at 124; *G.F.C.*, 686 So. 2d at 1384.

- 10 -

common law: giving children born to intact marriages legal fathers without the need for any adjudication of the fact of fatherhood. *See G.F.C.*, 686 So. 2d at 1384-85.[4]

In light of the interests the presumption serves and the "weighty policies" underlying it, we held in *Privette* that "there must be a clear and compelling reason based primarily on the child's best interests to overcome the presumption of legitimacy *even after* the legal father is proven not to be the biological father." *Privette*, 617 So. 2d at 309. We further held that the standard of proof in such proceedings should be "at least the equivalent of the burden of proof that would exist in proceedings to terminate the legal father's parental rights." *Id*. That is, the party seeking to establish paternity in someone other than the mother's husband

---

4. In *Privette*, we stated that a child's "legal father" is "the one listed on the birth certificate." 617 So. 2d at 307. This statement is consistent with statutory law, which reflects the common law, by requiring that the mother's husband's name be placed on the child's birth certificate "unless paternity has been determined otherwise by a court of competent jurisdiction." § 382.013(2)(a), Fla. Stat. (2015). In the instant case, Simmonds refused to provide the information necessary to comply with this law. However, this refusal did not change the effect of the common law as establishing her husband as the child's legal father unless and until that status is removed. *See Lander v. Smith*, 906 So. 2d 1130, 1131 n.1 (Fla. 4th DCA 2005); *see also Shuler v. Guardian ad Litem Program*, 17 So. 3d 333, 335 (Fla. 5th DCA 2009) ("Although some suggest that the common law rule has been altered, this much has remained clear as to the biological father of a child born during the course of the mother's intact marriage: The mother's husband is the child's legal father unless and until a court effects a substitution.") (footnote omitted).

must establish by clear and convincing evidence that overcoming the presumption

of legitimacy, and having the mother's husband replaced as the legal father, is the

outcome most consistent with reason, primarily because it would promote the

child's best interests.  *See id*. at 308-09 (citing *Santosky v. Kramer*, 455 U.S. 745

(1982)).[5]

Although the biological father in *Privette* was not the party seeking to have

his paternity declared, the test we established for that case, which involved an

effort by the State to locate a father to provide child support, *id*. at 307, is

appropriate for cases where it is the biological father who seeks an adjudication of

paternity.[6]  Unlike the test in effect at early common law, which required proof

_____

5. Although the *Privette* Court referenced another court's position that the presumption cannot be overcome unless common sense and reason are "outraged" by its application, 617 So. 2d at 309 (citing *State ex rel. H. v. P.*, 457 N.Y.S.2d 488, 491 (N.Y. App. Div. 1982)), we find this language unhelpful and unnecessary. As *Privette* held, the presumption is overcome when there is a "clear and compelling reason based primarily on the child's best interests."  *Id*.

6. We have said that the *Privette* test does not apply when the child does not face the threat of being declared "illegitimate" and when the legal father is not seeking to maintain his rights, while also stating that a child can never become "illegitimate" once the child is born into an intact marriage. *Daniel*, 695 So. 2d at 1255.  This discussion of legitimacy has caused some confusion. *See Drouin v. Stuber*, 168 So. 3d 305, 308 (Fla. 4th DCA 2015) (declining to find the *Privette* test applicable in part because the child did not "face the threat of being declared illegitimate").  We take this opportunity to clarify that the *Privette* test applies when a putative biological father and a legal father both assert rights concerning the child, even though no child born to an intact marriage can ever be declared "illegitimate" under our current law.

from witnesses other than the marital couple that the husband lacked access to the wife or the ability to procreate, *Michael H.*, 491 U.S. at 124, the *Privette* test accounts for the availability of modern methods of proof and the competing interests that arise in cases like this one—including the marital couple's right to privacy and the due process rights of both men involved in this scenario—interests that can be properly balanced only by a careful and conscientious fact finder familiar with the particularities of a given case. *See S.D. v. A.G.*, 764 So. 2d 807, 809 (Fla. 2d DCA 2000) (observing that cases involving children conceived between a married woman and a man who is not her husband are intensely fact-sensitive and "difficult, if not impossible, to address within the case law method"); *Lohman*, 963 So. 2d at 988 (noting that the law has "struggled to balance the sanctity of marriage, the right of privacy, and the best interest of children against the knowledge of paternity acquired by DNA testing").[7]

As shown through our decisions in *Kendrick* and *Privette*, we agree with the Fourth District that the presumption of legitimacy is rebuttable by a biological

---

7. For example, while evidence that the mother's husband has abused, abandoned, or neglected the child would be relevant to the child's best interests, *see G.F.C.*, 686 So. 2d at 1387, it might not be dispositive. Moreover, the presence of such severe facts is not required to establish that it would be in the child's best interests to recognize the biological father as the legal father.

father in the circumstances of Perkins and does not bar an action to prove paternity at the outset. *See id.*[8]

Accordingly, we approve the result reached by the Fourth District in *Perkins* and disapprove the First and Third District's decisions in *Slowinski* and *Tijerino*.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, and POLSTON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

    Fourth District - Case No. 4D16-3502

    (Broward County)

Victor H. Waite of Law Office of Victor H. Waite, P.A., Hollywood, Florida,

    for Petitioners

Nancy A. Hass of Nancy A. Hass, P.A., Fort Lauderdale, Florida,

    for Respondent

---

8. In this circumstance, a paternity action must be considered a hybrid of the declaratory judgment action we authorized in *Kendrick* and the paternity action governed by chapter 742, Florida Statutes (2015), such that the determination of whether the biological father should replace the mother's husband as the child's legal father is governed by the common law test developed in *Privette*, with issues concerning timesharing and child support governed by chapter 742 once the issue of paternity is resolved.