# Supreme Court of Florida

———

No. SC2024-1184

———

**ASHLEY NICOLE ISABEL BRITO,**
Petitioner,

vs.

**JENNIFER SALAS, et al.,**
Respondents.

———

No. SC2024-1190

———

**ANGEL GIOVANNI RIVERA,**
Petitioner,

vs.

**JENNIFER SALAS,**
Respondent.

December 30, 2025

GROSSHANS, J.

In this case, we are asked to decide whether a man whose sperm is used to conceive a child via at-home artificial insemination automatically relinquishes all paternal rights and obligations to the

child by operation of law. For the reasons that follow, we answer that question in the negative and quash the decision of the Second District Court of Appeal, which held otherwise.[1]

## I

This dispute arises out of Angel Rivera's decision to provide his sperm to Ashley Brito and Jennifer Salas. Employing an at-home artificial insemination kit, Brito used that sperm to become pregnant. After learning of the pregnancy, Brito and Salas got married. And in due course, Brito gave birth to the child at the center of this case. The birth certificate listed Brito and Salas as the child's parents.

Brito and Salas raised the child together for a little more than a year, at which point they separated. Brito moved out of the home, taking the child with her. Soon thereafter, Rivera reentered the picture. He filed a petition in circuit court, seeking to be recognized as the child's legal father.

Ultimately, the trial court denied Rivera's petition solely on the ground that he had relinquished his paternal rights under section

---

1. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

742.14, Florida Statutes (2020). That statute provides in relevant part that "[t]he donor of any egg, sperm, or preembryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children." § 742.14, Fla. Stat. The trial court reasoned that Rivera was a sperm "donor" who did not meet either of, what it concluded, were the statute's two exceptions to relinquishment. Consequently, the court held that Rivera had no parental rights as to the child, observing that the child was conceived by artificial insemination. According to the trial court, "[t]he fact that the procedure was not completed in a clinical setting does not alter the applicability of the statute or [the father's] designation as the donor."

The Second District affirmed. It agreed with the trial court that a sperm "donor" who is not a member of the commissioning couple relinquishes any parental rights. *Rivera v. Salas*, 391 So. 3d 639, 643 (Fla. 2d DCA 2024). Per the Second District, Rivera was "obviously the donor," and neither of section 742.14's two "exceptions" applied to him. *Id.* Relying on district precedent, the

court concluded that because Rivera "did not qualify under either exception, he automatically relinquished his parental rights under the statute." *Id.* at 643-44 (citing *A.A.B. v. B.O.C.*, 112 So. 3d 761, 762-63 (Fla. 2d DCA 2013)).

Notably, the Second District rejected the argument that section 742.14 was inapplicable because the child had not been conceived using "[a]ssisted reproductive technology" (ART), which is statutorily defined in part as "those procreative procedures which involve the laboratory handling of human eggs or preembryos." § 742.13(1), Fla. Stat. (2020). The court acknowledged that "[c]ommissioning couple" is itself defined as "the intended mother and father of a child who will be conceived by means of *assisted reproductive technology* using the eggs or sperm of at least one of the intended parents." *Rivera*, 391 So. 3d at 641 n.2 (quoting § 742.13(2)). However, because Rivera was not a member of "a commissioning couple," the court considered these definitions irrelevant. *Id.* at 643 (quoting *A.A.B.*, 112 So. 3d at 763). In the court's view, "nothing in section 742.14 requires that" ART be involved "for its conditions to apply." *Id.* at 644.

The Second District certified that its decision conflicted with

- 4 -

*Enriquez v. Velazquez*, 350 So. 3d 147 (Fla. 5th DCA 2022). There, the Fifth District Court of Appeal was confronted with a different underlying fact pattern: two close friends of the opposite sex, by agreement and with the intent of raising the child together, successfully conceived a child using at-home artificial insemination. *Id.* at 148. Several years after the child was born and after having been actively involved in the child's life, the man petitioned for a judicial determination of paternity and for timesharing with the child. *Id.* Although the mother never raised this issue, the trial court sua sponte concluded that the man was a "sperm donor" who had relinquished his paternal rights under section 742.14. *Id.* at 149, 150. It therefore denied his petition. *Id.* at 149.

The Fifth District reversed. It held "that section 742.14 applies to paternity actions only when the child was born as a result of assisted reproductive technology, which" does not include at-home artificial insemination. *Id.* at 150-51.

Although the court found our decision in *D.M.T. v. T.M.H.*, 129 So. 3d 320 (Fla. 2013), to be controlling,[2] it went on to

---

2. The Fifth District cited our statement in *D.M.T.* that "in enacting section 742.14, 'the Legislature articulated a policy of

independently assess the meaning of the statute. It noted that the term "donor" is not statutorily defined, prompting it to consider other sources bearing on the text's meaning. *Enriquez*, 350 So. 3d at 153. Dictionary definitions, the court observed, cast "donor" in broad language. *Id.* Under such definitions, "donor" could conceivably refer to a man who impregnated a woman during sexual intercourse. *Id.* Because that interpretation would create tension with other provisions in chapter 742, the court reasoned that section 742.14 should be read more narrowly. *Id.* at 153-54. Statutory context, the court concluded, indicated that section 742.14 was limited to the ART context. *Id.* at 154.

Then-Judge Sasso dissented. For one, she rejected the majority's conclusion that *D.M.T.* resolved the issue presented. *Id.* at 155-56 (Sasso, J., dissenting). As for the scope of section 742.14, she argued that "[b]y its plain terms the statute applies to 'any' donor, with two exceptions: 1) a 'commissioning couple' or 2) a

---

treating all individuals who provide eggs, sperm, or preembryos *as part of assisted reproductive technology* as "donor[s]" bound by the terms of the statute.' " *Enriquez*, 350 So. 3d at 151 (alteration in original) (quoting *D.M.T.*, 129 So. 3d at 333).

- 6 -

'father who has executed a preplanned adoption agreement under s. 63.213.' " *Id.* at 155. Because in her view the man was a sperm "donor" who fell within neither exception, he had relinquished his paternal rights as to the child. *Id.*

Based on the certified conflict with the divided *Enriquez* decision, Brito and Rivera have asked us to review the Second District's decision below. We granted that request.

## II

The conflict centers around the scope of the relinquishment provision in section 742.14. Brito and Rivera urge us to adopt a context-based interpretation of this provision, arguing that the statute only applies in situations where ART is involved.[3] Salas, by contrast, contends that section 742.14 broadly applies to any donation of reproductive material, regardless of the setting or method used to conceive the child. We agree with Brito and Rivera that the statute in question centers around the use of ART. Thus, Rivera's paternal rights and obligations to the child were not

---

3. The Family Law Section of The Florida Bar has filed an amicus brief also urging us to adopt this position.

*automatically relinquished* pursuant to section 742.14.  We do not, however, address in this narrow holding Rivera's likelihood of success in establishing any legal fatherhood rights under the traditional statutory requirements governing paternity.

To resolve this dispute, we focus, as always, on the text of the governing law.  *Ham v. Portfolio Recovery Assocs., LLC,* 308 So. 3d 942, 946 (Fla. 2020) (noting that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means" (alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012))).[4]  Our duty "is to arrive at a 'fair reading' of the text by 'determining the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued.' "  *Id.* (alteration in original) (quoting Scalia & Garner, *supra,* at 33).

We also emphasize that context is key to determining a text's meaning.  *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988) ("In

---

4.  Contrary to the Fifth District's analysis in *Enriquez,* our decision in *D.M.T.* does not resolve this issue.

- 8 -

ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  Thus, we must avoid reading statutory terms in isolation.  *See Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022) (highlighting "the 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation' " (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993))).  Instead, we must look to the context in which those terms are used, including the historical backdrop against which the statute was enacted.  *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (explaining that courts must take account of "the specific context in which" statutory terms are "used, and the broader context of the statute as a whole" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))); *Planned Parenthood of Sw. & Cent. Fla. v. State*, 384 So. 3d 67, 79 (Fla. 2024) (noting that the historical background of a text is relevant to its meaning (citing *Tomlinson v. State*, 369 So. 3d 1142, 1146 (Fla. 2023))).

### A

Before focusing on the particular provision at issue here, we

begin by exploring the background against which it was adopted. Section 742.14 was enacted by the Florida Legislature in 1993 as part of a larger act (1993 Act). Ch. 93-237, Laws of Fla.

Prior to the 1993 Act, only a handful of Florida statutes addressed nontraditional methods of reproduction. These laws primarily focused on artificial insemination, the oldest of such methods. *See* Malina Coleman, *Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction*, 17 Cardozo L. Rev. 497, 498 n.6 (1996). In 1973, the Legislature enacted the first artificial insemination statute: section 742.11. *See* ch. 73-104, § 1, Laws of Fla.[5] Other statutes addressing artificial

---

5. That section provided that "[a]ny child born within wedlock who has been conceived by the means of artificial insemination is irrebuttably presumed to be legitimate, provided that both husband and wife have consented in writing to the artificial insemination." § 742.11, Fla. Stat. (1973). The Legislature amended this language in 1990. *See* ch. 90-139, § 5, Laws of Fla. This amendment replaced the word "legitimate" with the phrase "the child of the husband and wife." *See id.* (codified at § 742.11, Fla. Stat. (Supp. 1990)). Additionally, it broadened the term "artificial insemination" to include "artificial or in vitro insemination." *Id.*

insemination were adopted in the late 1980s and early 1990s,[6] at which point it was considered "a widely accepted, nonexperimental medical procedure."  Walter Wadlington, *Artificial Conception: The Challenge for Family Law*, 69 Va. L. Rev. 465, 468 (1983).

Although artificial insemination had become more commonplace, it was not until 1983 that a woman successfully gave birth after having been implanted with the fertilized egg of another woman.  Anne Reichman Schiff, *Solomonic Decisions in Egg Donation: Unscrambling the Conundrum of Legal Maternity*, 80 Iowa L. Rev. 265, 268 n.12 (1995).  This groundbreaking technology thus made it possible for a child to have not one but two biological "mothers"—a birth mother and a genetic mother.  *Id.* at 265.  As a result, the practice of gestational surrogacy became feasible, whereby one woman (the gestational surrogate) is implanted with the fertilized egg of the child's intended mother.  *See id.* at 266.

This unprecedented division of the female reproductive role also created legal uncertainty as to which biological "mother" would

---

6.  These statutes focused on disclosure and testing requirements for semen used in artificial insemination.  *See* § 381.609, Fla. Stat. (Supp. 1988); § 381.6105, Fla. Stat. (1989).

assume maternal rights and obligations in the case of a child conceived via ART. *See id.* at 271 & n.32. Florida became one of the first states to address this issue through legislation. *Id.*[7]

Viewed as a whole, the 1993 Act, which ultimately resulted in the statutory scheme at issue here, can be understood as the Legislature's response to the developing technology that made gestational surrogacy possible. With that general background in mind, we now focus on the specific statutory provisions that were adopted as a result of this Act.

B

In its entirety, the 1993 Act added five new sequential statutes to chapter 742 (742.13-.17), and modified one pre-existing provision of the same chapter (742.11). The first of these is a definitions provision, applicable to the other provisions adopted or modified at

---

7. The Legislature's initial response to this issue came in 1988 when it enacted section 63.212, Florida Statutes, *see* ch. 88-143, § 1, Laws of Fla., part of which has since been renumbered as section 63.213, *see* ch. 2003-58, § 36, Laws of Fla. That statute does not use the term "gestational surrogacy," but it authorizes preplanned adoption agreements in circumstances involving volunteer mothers, who may or may not be related to the children they agree to gestate and surrender for adoption. *See* § 63.212, Fla. Stat. (Supp. 1988).

the same time.  *See* § 742.13, Fla. Stat. (definitions apply to sections 742.11 through 742.17).  In that provision, fifteen terms are defined.  Three of these terms are "gestational surrogate,"[8] "gestational surrogacy,"[9] and "gestational surrogacy contract,"[10] and the other twelve definitions refer either to specific laboratory procedures necessary in the surrogacy context or technical terms for human reproductive cells (or both).[11]

Also enacted were sections 742.15, which regulates gestational surrogacy contracts, and 742.16, which outlines the procedures for

---

8.  § 742.13(5), Fla. Stat. (1993) (defining "[g]estational surrogate" as "a woman who contracts to become pregnant by means of *assisted reproductive technology* without the use of an egg from her body" (emphasis added)).

9.  § 742.13(6) (defining "[g]estational surrogacy" as "a state that results from a process in which a commissioning couple's eggs or sperm, or both, are *mixed in vitro* and the resulting preembryo is implanted within another woman's body" (emphasis added)).

10.  § 742.13(7) (defining "[g]estational surrogacy contract" as "a written agreement between the gestational surrogate and the commissioning couple").

11.  These terms include "[a]ssisted reproductive technology," "[c]ommissioning couple," "[e]gg," "[f]ertilization," "[g]amete intrafallopian transfer," "[i]mplantation," "[i]n vitro," "[i]n vitro fertilization embryo transfer," "[p]reembryo," "[p]ronuclear stage transfer" (or "zygote intrafallopian transfer"), "[s]perm," and "[t]ubal embryo transfer."  § 742.13(1)-(4), (8)-(15).

the expedited affirmation of parental status for commissioning couples with respect to children born of gestational surrogates.

Furthermore, as part of this statutory scheme, section 742.17 identifies who will have control over the commissioning couple's eggs, sperm, or preembryos in various scenarios, such as "in the event of a divorce." This presumes that the commissioning couple will have stored (i.e., "frozen") some of their genetic material in anticipation of a reproductive procedure. Such storing of eggs, sperm, or preembryos is primarily directed to situations involving gestational surrogacy and ART.

Finally, the 1993 Act amended an existing statutory provision, section 742.11. Previously, that provision provided in its entirety that "any child born within wedlock who has been conceived by the means of artificial or in vitro insemination is irrebuttably presumed to be the child of the husband and wife, provided that both husband and wife have consented in writing to the artificial or in vitro insemination." § 742.11, Fla. Stat. (Supp. 1990). The revised statute adds an additional proviso: "Except in the case of gestational surrogacy." § 742.11(1), Fla. Stat. (1993). This statute

was also renumbered to include subsection (1) detailed above and new subsection (2), which provides as follows:

> Except in the case of gestational surrogacy, any child born within wedlock who has been conceived by means of donated eggs or preembryos shall be irrebuttably presumed to be the child of the recipient gestating woman and her husband, provided that both parties have consented in writing to the use of donated eggs or preembryos.

§ 742.11(2), Fla. Stat.

Like the other sections just discussed, this new subsection addressed the emerging technology that made it viable for a woman, including a gestational surrogate who herself could be married, to become pregnant with "donated eggs or preembryos."

Taken together, it is clear that this section of newly enacted statutes, as well as the one amended statute, focused almost exclusively on providing a legal framework for gestational surrogacy issues and laboratory-based reproductive procedures—i.e., ART.[12]

---

12. We disagree with the dissent's contention that our opinion focuses on the legislative purpose behind the 1993 Act, rather than the text and overall context of the statutory scheme at issue here. First, an understanding of the historical backdrop against which statutes were enacted can be helpful in illuminating the meaning of their text. *See Dep't of Comm. v. U.S. House of Representatives,* 525 U.S. 316, 335 (1999) ("An understanding of the historical background of the decennial census and the Act that governs it is

- 15 -

C

Nestled directly amid the statutory provisions we have

discussed is the statute at issue here, which reads as follows:

> The donor of any egg, sperm, or preembryo, other
> than the commissioning couple or a father who has
> executed a preplanned adoption agreement under s.
> 63.213, shall relinquish all maternal or paternal rights
> and obligations with respect to the donation or the
> resulting children. Only reasonable compensation
> directly related to the donation of eggs, sperm, and
> preembryos shall be permitted.

§ 742.14, Fla. Stat.

At the outset, we note the terms specifying who the statute

principally affects: "[t]he donor," "the commissioning couple," and "a

---

essential to a proper interpretation of the Act's present text."). Laws are not enacted in a vacuum, and in a situation such as this—i.e. where technology completely reshaped reproductive science—we think it proper to consider that historical background to aid our interpretation of the statutory text.

Second, although we note that the 1993 Act resulted in sequential statutory sections, our discussion of context focuses exclusively on the statutory text. It is true that these statutes are part of a larger chapter governing paternity, but the dissent does not point to any other provision within that chapter that would assist our contextual understanding of section 742.14, undermine our analysis, or support its contrary interpretation. To the extent we are viewing these provisions as a discrete scheme within the chapter, we do not do so arbitrarily; the Legislature itself segregated sections 742.11-17 by enacting definitions applicable only to these provisions and not applicable to the chapter as a whole.

father who has executed a preplanned adoption agreement."[13]

Meaningfully, the first two of these terms are introduced with "the."

Courts are to interpret statutes consistent with rules of grammar. *State v. Bodden*, 877 So. 2d 680, 685 (Fla. 2004) (explaining that "[t]he legislature is presumed to know the meaning of words and the rules of grammar" (alteration in original) (quoting

---

13. The last two terms here generally involve surrogacy—i.e., reproduction with the assistance of a woman who gestates, but who will not parent, the resulting child. Florida recognizes two types of situations whereby those seeking to have a child can use a third party to carry the child to birth. One option, "gestational surrogacy," must use genetic material from at least one member of "the commissioning couple" (i.e., the intended parents). *See* § 742.13(2), (6), Fla. Stat. The fertilized egg of another woman (which may, but need not, be the intended mother) is placed into the "[g]estational surrogate." § 742.13(5). The statute prohibits a gestational surrogate from contributing genetic material. *Id.* The other surrogacy option, "preplanned adoption," is highly regulated by statute and requires a third-party "volunteer mother" who agrees to bear a child for the intended couple using an agreed upon fertility technique. § 63.213(2), Fla. Stat. The genetic material of the volunteer mother may be used to conceive the child, and if it is, she may rescind her consent to the adoption within 48 hours of the child's birth and assume maternal rights. § 63.213(2)(a). Similarly, the genetic material of the intended father may (but need not) be used, and if it is, he remains responsible for the child even if the volunteer mother rescinds her consent to the adoption or if the agreement is terminated or not approved by the adoption court. § 63.213(2)(d). The fertility techniques listed in the preplanned adoption statute do not appear to include at-home artificial insemination.

*Fla. State Racing Comm'n v. Bourquardez*, 42 So. 2d 87, 88 (Fla. 1949))). Therefore, statutory terms generally "are to be given the meaning that proper grammar and usage would assign them." *Imhof v. Walton County*, 328 So. 3d 32, 41 n.8 (Fla. 1st DCA 2021) (quoting Scalia & Garner, *supra*, at 140).

We find the Legislature's precise word choice here to be significant. Under accepted rules of grammar, section 742.14's use of "the" rather than "a" in "*[t]he* donor" and "*the* commissioning couple" presupposes that these are particular and definable actors who must be involved for the statute to apply. *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'" (second alteration and omission in original) (quoting *Merriam-Webster's Collegiate Dictionary* 1294 (11th ed. 2005))); *Myers v. State*, 696 So. 2d 893, 900 (Fla. 4th DCA 1997), *quashed on other grounds*, 713 So. 2d 1013 (Fla. 1998) ("[T]he definite article, '*the*' . . . before a noun specifies a definite and specific noun, as opposed to any member of a class.").

- 18 -

By contrast, the use of an indefinite article, such as "a," does not denote a specific noun, but merely a member of a class. *See Myers*, 696 So. 2d at 900; *State v. Crose*, 378 So. 3d 1217, 1237 (Fla. 2d DCA 2024) ("*A* or *an* goes before a word or phrase denoting a person or thing (noun) but not a specific one. . . . The definite article, *the*, . . . usually introduces a particular thing or individual group, one that was mentioned before or whose existence is known or presumed to be known." (omissions in original) (quoting Paul W. Lovinger, *The Penguin Dictionary of American English Usage and Style* 1, 426 (2000))).[14]

With the difference between "the" and "a" in mind, as well as the overall statutory scheme, section 742.14's scope comes into focus. The text refers to "*[t]he* donor" and "*the* commissioning

---

14. Consider the following example, which illustrates the difference between "the" and "a": On the one hand, if my coworker were to tell me, "Please leave *the* pencil on my desk after lunch," that would imply there is a specific pencil in my possession that she wants me to leave on her desk. On the other hand, if my coworker were to tell me, "Please leave *a* pencil on my desk after lunch," that would imply that I could leave any pencil, not a specific one, on her desk. Put differently, the first example ("*the* pencil") assumes the existence of a specific pencil, whereas the second example ("*a* pencil") does not.

couple," rather than "*a* donor" or "*a* commissioning couple."[15]

Section 742.14's use of "the" instead of "a" in these phrases

indicates that there is a specific situation contemplated by the use

of the terms. *Cf. Covey v. Shaffer*, 277 So. 3d 694, 696 (Fla. 2d

DCA 2019) ("The use of the definite article 'the' in lieu of an

indefinite article such as 'a' . . . indicates that the statute has a

particular hearing in mind, i.e., the hearing for which the petitioner

is required to serve notice, rather than merely a possible, optional

hearing."). The statute, in other words, has a particular donation in

mind—i.e., one that involves both the referenced donor and the

referenced couple seeking to conceive a child using ART.[16] Section

---

15. We observe that the case below mistakenly refers to "*a* commissioning couple," *Rivera*, 391 So. 3d at 642, instead of "*the* commissioning couple." Our opinion in *D.M.T.* does the same, 129 So. 3d at 333, as does the Second District's opinion in *A.A.B.*, 112 So. 3d at 763, and both the majority and dissenting opinions in *Enriquez*, 350 So. 3d at 150; *id.* at 155 (Sasso, J., dissenting).

16. Furthermore, while section 742.14 specifically contemplates an ART-based process, a preplanned adoption agreement may or may not be at play depending on the type of fertility technique utilized. *See* § 63.213(6)(c). Thus, section 742.14's use of "a" to reference "a father who has executed a preplanned adoption agreement" indicates that a father who has entered into such an agreement may, but need not, exist for the statute to apply.

742.14 does not address, and therefore is not applicable in, situations where these specified actors are not involved and the statutory scheme is not in play.

The question then becomes who and what exactly is contemplated, and regulated, by these statutory terms. Although there is not a definition of "donor," the definitions provision applicable here does define "commissioning couple" as "the intended mother and father of a child who will be conceived by means of assisted reproductive technology using the eggs or sperm of at least one of the intended parents." § 742.13(2), Fla. Stat. This definition establishes three criteria for "commissioning couple" status: (1) that the couple consist of the intended mother and father[17] (2) of a child conceived via ART, and (3) use of the eggs or sperm of at least one of the intended parents. If any of these criteria are not met, then there is no commissioning couple.

_____

17. In *D.M.T.*, we held that sections 742.14 and 742.13(2), as applied, violated the Equal Protection Clauses of the Florida and U.S. Constitutions by prohibiting a same-sex couple from qualifying as the commissioning couple. 129 So. 3d at 344.

Relevant here is the second criterion. It requires that the child be conceived via ART, which is defined as "those procreative procedures which involve the laboratory handling of human eggs or preembryos, including, but not limited to, in vitro fertilization embryo transfer, gamete intrafallopian transfer, pronuclear stage transfer, tubal embryo transfer, and zygote intrafallopian transfer." § 742.13(1), Fla. Stat.

No party disputes that the child in this case was not conceived using ART, as at-home artificial insemination does not "involve the laboratory handling of human eggs or preembryos." *Id.* Because ART was not involved, section 742.13(2)'s second criterion was not met. Thus, the situation, contemplated by the statutory scheme as a whole, did not occur here. As such, Rivera has not automatically relinquished his paternal rights and obligations to the child at issue, and his legal rights must be determined by other sources of law addressing paternity.[18]

---

18. We emphasize that nothing in this opinion confers paternal or maternal rights or obligations on anyone who has waived those rights and obligations or been relieved of them by contract or otherwise.

Given the context in which section 742.14 exists, our interpretation—which recognizes that the statute refers to a defined set of circumstances involving ART—is both textually sound and consistent with the surrounding statutory provisions that focus almost exclusively on gestational surrogacy and the technology associated with that procedure.

We add one related point.  Section 742.14 provides for the *automatic* relinquishment of parental rights.  We find it implausible that this brief provision, contained within multiple other statutes primarily addressing surrogacy, was meant to regulate all reproductive material, and all nontraditional procreative methods, without regard for (or discussion of) the rights typically associated with biological parentage.  *See, e.g.*, § 39.462-.464, .467, Fla. Stat. (1989) (outlining detailed procedures for the termination of parental rights).

D

Finally, reading section 742.14 as being limited to the ART context avoids a potential conflict with section 742.11(1) and promotes greater harmony in the statutory scheme as a whole.  *See Davis*, 339 So. 3d at 324 ("Under the whole-text canon, proper

- 23 -

interpretation requires consideration of 'the entire text, in view of its structure and of the physical and logical relation of its many parts.' " (quoting Scalia & Garner, *supra*, at 167)); *Parks v. State*, 411 So. 3d 414, 418 (Fla. 2025) ("[V]arious portions of an enactment [must] be read—to the extent that it is reasonably possible—in a manner that produces a harmonious whole." (citing *Tsuji v. Fleet*, 366 So. 3d 1020, 1025 (Fla. 2023))).

As noted above, section 742.11(1) creates an irrebuttable presumption that "any child born within wedlock who has been conceived by the means of artificial . . . insemination" is "the child of the husband and wife, provided that both husband and wife have consented in writing to the artificial . . . insemination." If, as Salas argues, section 742.14 applies to anyone whose reproductive material is used in an artificial insemination process subject only to the two listed exceptions discussed above, then the statute is undoubtedly in tension with section 742.11(1)'s irrebuttable presumption for children born "within wedlock."

Consider the following hypothetical scenario: A husband and wife conceive a child via at-home artificial insemination using the husband's sperm. Because ART was not involved, the husband and

wife were not the commissioning couple. Therefore, if the husband is considered the "donor" under section 742.14, he has automatically relinquished all of his paternal rights and obligations to the child. Yet, if both he and his wife have consented in writing to the artificial insemination, then under section 742.11(1) the husband is irrebuttably presumed to be the child's legal father. These two outcomes are inconsistent, even though each is seemingly compelled by a different provision.

Moreover, and with more striking implications, the effect of adopting Salas's interpretation would be to turn section 742.11(1)'s written consent requirement into the *only* method by which a husband who conceives a child via artificial insemination can avoid relinquishing his paternal rights and obligations, assuming that this section could override the relinquishment provision of 742.14. That is, if section 742.14 applied in the broad manner Salas suggests, then a husband who does not consent in writing—or even whose wife neglects to provide her written consent—to artificial insemination (something that can be done within the privacy of their home) automatically relinquishes his paternal rights and obligations to the resulting child. That outcome, we think, would

be unsound and contrary to the canon of statutory construction that a court should not construe a statute to reach an absurd result. *See McCloud v. State*, 260 So. 3d 911, 918-19 (Fla. 2018) (explaining that a statute generally should be interpreted to avoid absurdities); *State v. Iacovone*, 660 So. 2d 1371, 1373 (Fla. 1995) ("Statutes, as a rule, 'will not be interpreted so as to yield an absurd result.' " (quoting *Williams v. State*, 492 So. 2d 1051, 1054 (Fla. 1986))).

And, endorsing Salas's interpretation would mean that an unmarried man whose sperm is used to conceive a child via at-home artificial insemination would *always* relinquish his paternal rights and obligations under section 742.14. In short, a man such as the one in *Enriquez* would always be "[t]he donor," notwithstanding his subsequent involvement in the child's life. This result, depending on the facts of each individual case, would raise serious constitutional concerns. *See Simmonds v. Perkins*, 247 So. 3d 397, 401 (Fla. 2018) (recognizing a biological father's "right to bring an action to establish his parental rights as the father as long as he has 'manifested a substantial and continuing concern for the welfare of the children' " (quoting *Kendrick v. Everheart*, 390 So. 2d

53, 61 (Fla. 1980))); *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause" (alteration in original) (quoting *Caban v. Mohammed*, 441 U.S. 380, 392 (1979))).

It is a well-settled principle of statutory construction that when faced with two reasonable interpretations of a statute, we are instructed to adopt the one that avoids constitutional questions. *See Hiers v. Mitchell*, 116 So. 81, 84 (Fla. 1928) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." (quoting *Burr v. Fla. E. Coast Line Ry. Co.*, 81 So. 464, 468 (Fla. 1919))). We believe that our contextual interpretation does just that by avoiding the myriad of potential constitutional issues that a broader reading of this provision would create. *See State ex rel. City of Casselberry v. Mager*, 356 So. 2d 267, 269 n.6 (Fla. 1978) ("Courts always endeavor to preserve statutes and to avoid

constitutional issues." (citing *Chiapetta v. Jordan*, 16 So. 2d 641 (Fla. 1944))).

In conclusion, it is a mistake to interpret this provision in isolation and devoid of the whole context in which it is used. *See Alachua County v. Watson*, 333 So. 3d 162, 170 (Fla. 2022) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon . . . ." (quoting Scalia & Garner, *supra*, at 167)). Indeed, the more one isolates terms, such as "donor," from the rest of the statutory scheme, the less coherent that interpretation of section 742.14 becomes. Put differently, "donor" does not so much define the terms that surround it as it is defined by those surrounding terms. Those other terms, as well as the context and history of these statutes, support our conclusion that section 742.14 does not apply unless ART is involved.

### E

The primary basis of our disagreement with the dissent is whether section 742.14's scope depends on its whole text and context within the interrelated statutory scheme or whether the statute applies to anyone whose conduct indicates they are a

"donor" of reproductive material.  We have explained our approach to the text and now address that of the dissent.

We begin by noting that the dissent does not discuss the surrounding statutory provisions, or even section 742.14 as a whole, but instead focuses almost exclusively on the term donor, which it misguidedly "pulls out of the entire statutory scheme." *Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1117 (Fla. 2021).

The dissent asserts that, as a matter of ordinary usage, "donor" refers to "one who gives."  And where, as here, biological material (e.g., sperm) is involved, the term "donor" ordinarily suggests that the person giving away that material is also the source of it.  Hence, a man who gives away his dead brother's frozen sperm would not qualify as the donor.  So far, so good.[19]

But this is where we part ways.  The dissent asserts, without authority, that "someone who donates is easily distinguished from someone who . . . parents."  In other words, the dissent is of the

_____

19.  The dissent then proceeds to cite a bevy of other Florida statutes defining "donor" in various unrelated contexts, such as cancer drug donation.

opinion that the term donor does not encompass a child's prospective parents. This analysis is flatly contradicted by the text of section 742.14.

By creating exceptions for the commissioning couple and a father who has executed a preplanned adoption agreement, section 742.14 "clearly anticipates that the person seeking to take advantage of either exception is both the donor and one of the prospective parents." *Rivera*, 391 So. 3d at 642 n.5. Or, as we have said, "the structure of section 742.14 designates these groups as fitting within the term 'donor,' and then provides that they are specifically exempted from the statutory relinquishment of parental rights." *D.M.T.*, 129 So. 3d at 333. Reading the term "donor" to exclude the child's intended parents would render these exceptions superfluous. *See Martinez v. State*, 981 So. 2d 449, 452 (Fla. 2008) (rejecting an interpretation that would render a statutory exception superfluous); *see also Tsuji*, 366 So. 3d at 1029 (describing the "canon against surplusage" as "an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible" (quoting *Hechtman v. Nations Title Ins. of N.Y.*, 840 So. 2d 993, 996 (Fla.

2003))).  Put differently, if, as the dissent argues, "the statute did not apply to these groups, then they would not need to be exempted from its requirements."  *D.M.T.*, 129 So. 3d at 333.

Earlier in its opinion, the dissent apparently concedes this point.  It admits that section 742.14's relinquishment provision does not apply if "(1) *the donor* is a part of the 'commissioning couple' or (2) *the donor* is a 'father who has executed a preplanned adoption agreement under s. 63.213.' "  (Emphasis added and footnote omitted.)  The dissent later attempts to explain why a child's prospective parents are not "donor[s]."  "Section 742.14's exceptions," it says, "demonstrate that the Legislature clearly acted to create safe harbors for persons who, at the time of conception, exclude themselves by definitive action from the category of donors who relinquish all parental rights."  This statement, which observes that prospective parents are "exclude[d] . . . from the category of donors who relinquish all parental rights," again implies that prospective parents are included in the category of donors who do not relinquish those rights.

Nor do our dissenting colleagues explain how their interpretation of "donor" squares with this Court's decision in

*D.M.T.* With one exception,[20] the dissent relegates *D.M.T.* to a brief footnote, in which it dismisses "[w]hatever we have previously said about the relevance of the exact content of a donor's intent" and refers to these statements as "dicta." We disagree with that view and note that this Court plainly held that "[t]he plain language of section 742.14 does not provide for the subjective intentions of someone . . . to be taken into consideration in determining whether he or she is a 'donor' under the terms of the statute." 129 So. 3d at 333. Significantly, *all seven* justices agreed on this point, even those in the dissent. *See id.*; *id.* at 353 (Polston, C.J., dissenting).

Rather than addressing this portion of *D.M.T.*, the dissent

---

20. In its only citation to *D.M.T.* in the body of its opinion, the dissent quotes the following language from that decision:

> It is clear that the primary purpose behind the Legislature's enactment of the assisted reproductive technology statute was to ensure that couples taking advantage of medical advances in reproductive science to conceive a child are protected from a claim to parental rights by a third-party provider of the genetic material used for assisted reproductive technology.

129 So. 3d at 334. What the dissent fails to realize is that this quotation, among many others in *D.M.T.*, supports our ART-based interpretation in that it refers to "genetic material used for *assisted reproductive technology.*" *Id.* (emphasis added).

contends that "[w]e need not inquire into Rivera's 'subjective intentions' " to determine whether he intended to be a parent and, thus, whether he qualifies as the donor. The dissent assures us that we know based on Rivera's "conduct"—i.e., "leaving a sperm sample at the home of a couple he knew were prospective parents"—that he is the donor and therefore has automatically relinquished all rights under the statute. We do not understand how the dissent is basing its conclusion on anything other than, in its view, Rivera's subjective intent not to parent. But even assuming that the dissent's view as to these particular facts were correct, can the dissent be so certain about a man such as the one in *Enriquez*, whose conduct reflected that he intended to and subsequently acted as the child's father? *See* 350 So. 3d at 155 (Sasso, J., dissenting) (arguing that the text indicated the man was a "donor" who relinquished his parental rights under section 742.14). We are also at a loss to understand how a lower court could apply the dissent's approach to this term in light of *D.M.T.*, which is also binding precedent. How could a trial court judge possibly determine whether a man whose "conduct" shows he gave sperm for use in at-home artificial insemination qualifies as a

- 33 -

"donor" or a "parent" without looking at his intent, which *D.M.T.* prohibits?

Moreover, the dissent does not dispute our grammatical argument based on section 742.14's reference to "*[t]he* donor" and "*the* commissioning couple," which presupposes that those actors must be involved for the statute to apply. Our dissenting colleagues' only response is to ask, "so what?" According to them, "[t]here is no dispute in this case about the identity of the donor." Yet the dissent fails to address that the other actors, specifically referenced in the statute, are not present here. And we find that critical because it goes to the core of our disagreement which does not turn on what "donor" means as the dissent emphasizes. Rather, the disagreement hinges on whether the situation here, which did not involve the use of ART, is regulated at all by this particular statutory provision. Our grammatical interpretation indicates that it is not.

Finally, the dissent asserts that our interpretation of section 742.14 would allow for children conceived via at-home artificial insemination to have three legal parents. This result, the dissent says, would be unprecedented in Florida and could certainly not be

what the Legislature intended when it enacted this statute. This provocative assertion has several flaws.

For one, in teasing out its three-parent argument, the dissent misapprehends the scope of the question we have been asked to decide. To repeat, the conflict issue is whether, under section 742.14, a man whose sperm is used to conceive a child via at-home artificial insemination *automatically relinquishes* all paternal rights and obligations as to the child. Our answer to that narrow question, for the reasons given above, is "no." We do not address, as the dissent implies, whether Rivera is likely to succeed in establishing any legal rights under the statutes governing paternity, especially given that the child in question was born within an intact marriage.[21]

Insofar as the three-parent scenario the dissent envisions is

---

21. "[S]ections 742.13 and 742.14 do not create a statutory basis for an individual who would not otherwise have parental rights to claim those rights." *D.M.T.*, 129 So. 3d at 342. In other words, "section 742.14 does not operate to grant rights, but only to eliminate rights that are already held or that may develop." *Id.* Therefore, a man such as Rivera "becomes a parent only if he . . . has some legal basis to be recognized as a parent," which "could be due to a biological connection plus the assumption of parental responsibilities . . . or through application of another statute." *Id.*

conceivable, that is not because of our interpretation of section 742.14, but because of this Court's prior decision in *D.M.T.*—which no party has asked us to revisit—as well as the U.S. Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015), which held that same-sex couples have a constitutional right to marry. The dissent's three-parent argument says nothing about what section 742.14 meant at the time it was enacted—two decades before *D.M.T.* and *Obergefell*. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))). When the Legislature adopted these statutes, Florida law did not allow a child to have two parents of the same sex, let alone three parents. *See G.F.C. v. S.G.*, 686 So. 2d 1382, 1384 (Fla. 5th DCA 1997) ("[T]here is no such thing as dual fathership [under Florida law]."); *T.M.H. v. D.M.T.*, 79 So. 3d 787, 821 (Fla. 5th DCA 2011) (Lawson, J., dissenting) ("Section 742.14, consistent with the rest of Florida's relevant statutory law, is drafted so that each child has only one legal mother and one legal father."), *approved in part and disapproved in part, D.M.T.*, 129 So. 3d 320; 23 Fla. Prac., *Florida Family Law* § 6:5 (2011) (explaining

- 36 -

that "a child cannot legally have two fathers or two mothers");
§ 63.042(3), Fla. Stat. (1993) (making a person ineligible to adopt "if
that person is a homosexual"); § 741.04, Fla. Stat. (1993) (providing
that a marriage license may not be issued "unless one party is a
male and the other party is a female"). It was not until *D.M.T.*,
however, that this Court held as a matter of federal and Florida
constitutional law that a child may have two legal mothers, i.e., a
birth mother and genetic mother. 129 So. 3d at 347; *see also id.* at
356 (Polston, C.J., dissenting) (arguing that under the majority's
logic, "a child could have a constitutional right to two mothers and
a father"). And it was not until *Obergefell* that a child could be born
in Florida within a marriage consisting of two persons of the same
sex.

Our interpretation of the 1993 statute should not be controlled
by a potential legal complication that was created, not by the
Legislature, but by subsequent court decisions that opened the
door to three-parent families. The dissent's criticism of our
interpretation on this point is therefore misdirected.[22]

---

22. We also observe that this Court has already developed a
framework by which the paternal interests of a biological father of a

The dissent, in short, offers no persuasive reason why we should abandon our textually and contextually sound reading of section 742.14 in light of the legal uncertainties created by subsequent court decisions and left unaddressed by legislative action.

## III

For the foregoing reasons, we hold section 742.14 only applies when assisted reproductive technology is involved. Accordingly, we quash the decision below. We also disapprove the Second District's decision in *A.A.B.* and approve the outcome of the Fifth District's decision in *Enriquez*.

It is so ordered.

MUÑIZ, C.J., and CANADY and LABARGA, JJ., concur.
COURIEL, J., dissents with an opinion, in which FRANCIS and
SASSO, JJ., concur.

---

child born within wedlock are adjudicated. *See Simmonds*, 247 So. 3d at 402 ("[T]he party seeking to establish paternity in someone other than the mother's husband must establish by clear and convincing evidence that overcoming the presumption of legitimacy, and having the mother's husband replaced as the legal father, is the outcome most consistent with reason, primarily because it would promote the child's best interests." (citing *Dep't of Health & Rehab. Servs. v. Privette*, 617 So. 2d 305, 308-09 (Fla. 1993))).

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

COURIEL, J., dissenting.

To our readers, this case likely presents no shortage of difficult questions. But our work turns on just one, and it isn't the one the Court sets out to answer ("whether a man whose sperm is used to conceive a child via at-home artificial insemination automatically relinquishes all paternal rights and obligations to the child by operation of law"). Indeed, as those last four words suggest, that question was answered in the law we must apply to this case, by the Legislature.

Section 742.14, Florida Statutes, says nothing about "a man whose sperm is used to conceive a child." It speaks of a "donor." Our job is to decide what "donor" means in the relevant context, give the applicable law its most plausible reading, and apply it to the facts of this case. Because the majority gets that job wrong, I respectfully dissent.

**I**

Ashley Brito and Jennifer Salas decided they wanted to raise a child together, so they asked two different men to be sperm donors.

The first agreed, but his involvement resulted in two failed at-home insemination attempts. They then turned to Angel Rivera, who brought a sample of his sperm to their home and left. The insemination was successful, and Brito and Salas married. Rivera was not involved in the pregnancy that followed. The child's birth certificate lists Brito and Salas as the two parents. Rivera now seeks to be recognized as the child's parent, too.

**II**

The majority is right that, to resolve this case, we begin with the text of section 742.14:

> The donor of any egg, sperm, or preembryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children.

§ 742.14, Fla. Stat. (2020). By its plain terms, section 742.14 provides that the "donor" of "sperm" "shall relinquish all maternal or paternal rights" unless one of two exceptions applies: (1) the donor is a part of the "commissioning couple" or (2) the donor is a

"father who has executed a preplanned adoption agreement[23] under s. 63.213." *See Enriquez v. Velazquez*, 350 So. 3d 147, 155 (Fla. 5th DCA 2022) (Sasso, J., dissenting) (analyzing the text of section 742.14 and observing that where "donor" status is not disputed, if neither of section 742.14's exceptions apply, the donor has relinquished all parental rights).

As the majority concedes, neither of these exceptions apply here, so this case turns on whether Rivera is a "donor" for purposes of section 742.14. He is.

**A**

The term "donor" is not defined in chapter 742, so "we presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears." *Conage v. United States*, 346 So. 3d 594, 599 (Fla. 2022). For evidence of that ordinary meaning, we start with dictionary

---

23. A "preplanned adoption agreement" is "a written agreement among the parties that specifies the intent of the parties as to their rights and responsibilities in the preplanned adoption arrangement." § 63.213(6)(g), Fla. Stat. Section 63.213 sets forth the law governing these agreements. No such agreement was executed in this case.

definitions from the time the statute was enacted. *See id.* "Donor" is, then and now, defined as "one that gives." *Donor, Webster's Third New International Dictionary* (1986); *see also Black's Law Dictionary* (6th ed. 1990) (defining "donor" as "[o]ne who makes a gift"). So far, so familiar to any reasonably informed user of the English language.

Some dictionaries provide definitions of "donor" as, for example, "[o]ne used as a source of biological material." *Webster's Third*; *see also The American Heritage College Dictionary* (3d ed. 1993) (defining donor to include "[o]ne from whom blood, tissue, or an organ is taken for use in a transfusion or transplant"). And so ordinary English language usage includes the terms "blood donor," "organ donor," and yes, "sperm donor." Regardless of the type of biological material being given, our ordinary usage of these terms reflects a necessarily donative intent. This intent is evident from the actions of the donor, for a donor who does not give is no such thing. Blood donors often (but not always) go to a Red Cross bus to give blood; organ donors often (but not always) opt in at the DMV; and sperm donors often (but not always) leave samples at a sperm bank.

In any usage, the ordinary meaning of "donor" conveys an alienation of something by the donor—a parting with that is irreconcilable with the meaning ascribed to the word by the majority.[24] There is overwhelming evidence of this prevailing ordinary meaning of the word throughout our laws. Taking just a few examples, in the context of organ donation, "donor" "means an individual who makes an anatomical gift of all or part of his or her

---

24. Whatever we have previously said about the relevance of the exact content of a donor's intent, *see D.M.T. v. T.M.H.*, 129 So. 3d 320, 333 (Fla. 2013), one simply cannot be called a "donor" without a basic intent to give, any more than a person can be a thief if he does not intend to steal—whatever the object of the thief's desire. And the majority is correct: no party to this case has briefed, and so we do not here examine, the difference between having the general intent to give (inherent in donation) or to steal (inherent in theft), as opposed to the specific intent to give or steal a particular thing, to or from a particular person. We need not inquire into Rivera's "subjective intentions" in that sense. From his conduct—leaving a sperm sample at the home of a couple he knew were prospective parents—we know enough to call him what an ordinary speaker of English would call him: a donor.

Lastly on this point, though the majority seizes on certain language in *D.M.T.* to say that our definition of "donor" cannot be correct, it is beyond dispute that this language constitutes dicta. *D.M.T.* involved egg donation using assisted reproductive technology as that term is defined in the statute, so the Court had no occasion to decide the applicability of section 742.14 outside that context, as we obviously must, here. *See Enriquez,* 350 So. 3d at 156 (Sasso, J., dissenting) (citing *Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020)).

body." § 765.511(9), Fla. Stat. (2025). Likewise, in the statute that criminalizes a health care provider transferring reproductive material into an unknowing patient (reproductive battery), "donor" means "a person who donates reproductive material, regardless of whether for personal use or compensation." § 784.086(1)(a), Fla. Stat. (2025). Florida's cancer drug donation statute defines "donor" as "a patient or patient representative who donates cancer drugs or supplies needed to administer cancer drugs." § 499.029(3)(c), Fla. Stat. (2025). In setting forth the liability of entities that distribute canned or perishable food free of charge, the relevant statute contains a detailed definition of "donor," which goes so far as to explicitly include operators of "[a]ny public location with vending machines dispensing prepared meals." § 768.136(1)(a)2., Fla. Stat. (2025). And in the context of volunteers serving various state agencies, a "material donor" is "any person who provides funds, materials, employment, or opportunities for clients of state departments or agencies, without monetary or material compensation." § 110.501(1), Fla. Stat. (2025).

What are we to discern from this evidence? First, the Legislature has shown that when it wants to give the term "donor" a

non-colloquial or more specific meaning, it knows how. When it does not, we can deduce that it has made a choice within its constitutional authority for the word to mean what it does to an ordinary user of English.

Second, even where the Legislature has given "donor" a non-colloquial meaning, that definition tracks one indispensable component of the term's everyday understanding: a "donor" is one who gives—whether giving biological material, medicine, food, or funds and material. True, these definitions appear in widely divergent statutes, but there is no indication that the use of "donor" in section 742.14 would not likewise align with this core of its ordinary meaning. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text . . . .").

And third, someone who donates is easily distinguished from someone who loans (and gives with the expectation of return), or promises (and may give at a later date), or, most to the point, parents (and gives, and loans, and promises, perhaps, but is never in ordinary usage just a supplier of biological material). The majority uses words the Legislature might have used, but did not,

when it describes Rivera as "a man whose sperm is used to conceive a child."  The Legislature chose "donor," and added that any such person who is not a member of the "commissioning couple" or "a father who has executed a preplanned adoption agreement"[25] relinquishes his or her parental rights.  § 742.14, Fla. Stat.[26]

---

25.  A preplanned adoption agreement is defined in section 63.213, and contemplates fertility techniques including in vivo artificial insemination.  That technique does not involve the "laboratory handling of human eggs or preembryos" as contemplated by "assisted reproductive technology."  The majority's reading of the law, it would seem, is that sperm donors are treated differently depending on the kind of artificial insemination used, that is, whether it results in in vitro or in vivo fertilization.

26.  Rejecting our interpretation of "donor," the majority observes that section 742.14's exceptions ("commissioning couple" and a "father who has executed a preplanned adoption agreement") contemplate the possibility that a "donor" could also be a prospective parent.  With this point, the majority proves that its reading of "donor" (apparently anyone whose biological material is used—but wait—only if "assisted reproductive technology" is also used) is possible as a matter of logic.  But we often have to choose from among several logically possible readings of a statute.  For the reasons we have explained, we think our reading, grounded in the ordinary meaning of "donor," is best.  Section 742.14's exceptions demonstrate that the Legislature clearly acted to create safe harbors for persons who, at the time of conception, exclude themselves by definitive action from the category of donors who relinquish all parental rights.  As all agree, Rivera did not take any such action. He came back into the picture after the child was born, and after doing none of the things the statute prescribes to establish oneself as something other than a donor.

Construing this language as it applies to the facts of this case—the only case before us, however many hypotheticals we ponder—it is clear that Rivera is such a person.

Pay no mind to all this, says the majority; instead, it turns to the statute's use of definite and indefinite articles as a guide to meaning.  The statute says "*the* donor" rather than "*a* donor."  We are to reason that, because section 742.14 uses "the" rather than "a," the statute "presupposes that these are particular and definable actors who must be involved for the statute to apply."  Fair enough—but so what?  There is no dispute in this case about the identity of the donor.  We select articles to resolve ambiguity about which person or thing we mean among one or more persons or things.  Here, there is no such ambiguity.  There is but one "donor."  The majority's effort amounts to little, anyhow, as the text refers to "the donor" of "*any* sperm."  Rivera is a donor and, in this case, also the donor.

**B**

The majority decides it cannot give the word "donor" its ordinary meaning because of its statutory surroundings.  There it

has things backward, for the relevant statutory context forecloses the majority's interpretation.

Our colleagues say that section 742.14 only applies if "assisted reproductive technology," as that term is defined in the statute, is used. To support this reading, the majority observes that the 1993 Act aimed to provide a legal framework for such technology. And no doubt the 1993 Act was a response to technological and social developments.[27] But no statutory or historical context supports rewriting the statute as the majority undertakes to do.[28]

---

27. Much of our disagreement with the majority flows from its methodological choice to start here. With what it views as this legislative purpose in mind, the majority concludes the Legislature must have meant to limit "the donor of any sperm" to donations that occur in the context of assisted reproductive technology—a term that is defined in section 742.13, but does not appear at all in section 742.14. The relevant context, says the majority, are the remaining sections of the 1993 Act, which dealt with gestational surrogacy. Not so. It is the *statutory* context that is relevant to interpreting the provision in dispute (that is, the surrounding law we describe in the next few paragraphs), and not the purpose of the people who voted for the 1993 Act.

28. To support its emphasis on "historical backdrop," the majority invokes our decision in *Planned Parenthood of Southwest & Central Florida v. State*, 384 So. 3d 67, 79 (Fla. 2024). There, we explained how we often look to the "historical background *of the phrases contained within the operative text*." *Id.* (emphasis added).

- 48 -

In its evaluation of the relevant statutory context, the majority says section 742.14 is "[n]estled directly amid" its neighbors, a "brief provision . . . contained within multiple other statutes primarily addressing surrogacy." Well, no. Section 742.14 is, of course, a separately enumerated section of our statutes, not hard to find, about the "[d]onation of eggs, sperm, or preembryos," in a chapter of the code about the "Determination of Parentage." Its neighboring provisions include, yes, a law about gestational surrogacy contracts, but also laws about the establishment of paternity for children born out of wedlock, criminal penalties for false statements of paternity, and the legal effect of adoption.

It is the chapter as a whole that provides the relevant statutory context. And that context is this: our laws about parentage reflect a consistent legislative design that assigns two, and only two, parents to a minor child. Take, for example, chapter 63, which governs adoption, that is, "the act of creating the legal

Today, the majority's decision does not engage with the historical background of the phrases in the operative text. Instead it discusses the history that led to the passing of the 1993 Act. This is an inquiry into legislative intent, not an effort to understand the meaning of words from how they were used at the relevant time.

relationship between parent and child where it did not exist." § 63.032(2), Fla. Stat. (2025).  Critically, an adoption does not just create new legal rights, it also relieves at least one birth parent of all parental rights and responsibilities.  *See* § 63.172(1)(a), Fla. Stat. (2025).  Given the great significance of this action, unless excused by the court, a petition to adopt a minor requires the consent of the birth mother.  § 63.062(1)(a), Fla. Stat. (2025).  The very "Parenting Plan" form promulgated by this Court for use statewide in family law cases likewise provides for two parents: one petitioner-parent and one respondent-parent.[29]

That Salas and Brito have parental rights has never been disputed in this litigation, and there is no indication that either would forfeit those rights.  But now, the majority authorizes Rivera to become parent number three.  This might be good or bad policy by the Court's lights, but it is not our law.  And it is, to put it mildly, a stretch to think that the Legislature created a third potential parental relationship simply by declining to define a

---

29.  https://flcourts-media.flcourts.gov/content/download/686031/file_pdf/995a.pdf.

- 50 -

word—one with a commonly understood meaning, at that.

After observing that the term "donor" is not defined in the statute, the majority pivots to the definition of "commissioning couple," which requires that the child be conceived via assisted reproductive technology. *See* § 742.13(2), Fla. Stat. Assisted reproductive technology, in turn, requires "the laboratory handling of human eggs or preembryos." The majority observes that there was no laboratory handling in this case of at-home insemination, and says that therefore section 742.14 simply does not apply.

When it comes to construing the statute to understand Rivera's rights, this argument, too, comes to grief. First, assisted reproductive technology is defined as "those procreative procedures which involve the laboratory handling of human eggs or preembryos, including, but not limited to, in vitro fertilization embryo transfer, gamete intrafallopian transfer, pronuclear stage transfer, tubal embryo transfer, and zygote intrafallopian transfer." § 742.13(1), Fla. Stat. Notably missing from this definition is the biological material at issue in this case—sperm. It is hard to see how the term speaks at all to the donation of those particular gametes. Second, the term "assisted reproductive technology" is

incorporated into section 742.14 only by its reference to the term "commissioning couple," which is excepted from the statute's reach. It would have been an odd legislative choice indeed to have limited section 742.14 in its entirety based on a scenario to which the statute purports not to apply. *See Enriquez*, 350 So. 3d at 158 (Sasso, J., dissenting) ("Applying the [L]egislature's definition of 'assisted reproductive technology' to the term 'donor' in section 742.14 would replicate the defined phrase twice—once to limit the term 'donor,' and again to limit the term 'commissioning couple.'"). The parties here did use artificial insemination, a term which does in fact appear in section 742.11, and must, as a matter of logic, mean something other than—broader than—a deployment of assisted reproductive technology. It stands to reason, then, that the word "donor" in 742.14 can refer to a person other than a user of assisted reproductive technology.

And what about section 742.11(1), which creates an irrebuttable presumption that "any child born within wedlock who has been conceived by the means of artificial . . . insemination" is "the child of the husband and wife, provided that both husband and wife have consented in writing to the artificial . . . insemination"?

- 52 -

The majority warns (but importantly does not decide) that if "section 742.14 applies to anyone whose reproductive material is used in an artificial insemination process," subject to the section's two exceptions, then the statute conflicts with section 742.11(1)'s irrebuttable presumption.

There is no such conflict. First, 742.11(1)'s irrebuttable presumption of course does not apply in this case because there was no written consent to the artificial insemination. However, because Brito and Salas were married and listed as parents on the child's birth certificate, Florida law recognizes them as such. *See Dep't of Health & Rehab. Servs. v. Privette*, 617 So. 2d 305, 307 (Fla. 1993). Second, as we have shown, section 742.14 does *not* apply to "*anyone* whose reproductive material" is merely "*used*" in an artificial insemination process. It applies to "donor[s]." And while it is true that a parent's reproductive material can be "used in an artificial insemination process," that doesn't make a parent a "donor" in the sense that term is commonly understood—the sense, again, that the Legislature chose to give it here, by not defining it differently.

So, in the majority's hypothetical where a husband and wife

- 53 -

use, and consent in writing to, at-home insemination, section 742.11(1)'s irrebuttable presumption would indeed apply. And section 742.14 would not disturb that presumption because the husband in that situation is plainly not a "donor." For this reason, the majority is also incorrect that applying the ordinary meaning of "donor" would make section 742.11(1)'s written consent requirement the only way for a father using artificial insemination to avoid relinquishing his parental rights.[30] Distinguishing between the majority's hypothetical husband and Rivera here—in terms of who is a "donor"—is not difficult.

The majority's arguments about context really boil down to a concern for the Legislature's intent. Today's decision just about says the quiet part out loud when it states, "the 1993 Act . . . can

---

30. The majority's invocation of the absurdity doctrine is misplaced. It is a canon of interpretation we use when (1) the alleged absurdity consists of a "disposition that no reasonable person could intend"; and (2) "[t]he absurdity must be reparable by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." Scalia & Garner, *supra*, at 237-38. Even assuming the first of these requirements is met here (it isn't, because a husband is not a donor), the second plainly is not. The majority's opinion does not suggest that some technical or ministerial error occurred in the drafting of section 742.14.

be understood as the Legislature's response to the developing technology that made gestational surrogacy possible." While "context includes the purpose of the text," that "purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." Scalia & Garner, *supra*, at 56; *see also Atl. Candy Co. v. Yowie N. Am., Inc.*, 400 So. 3d 850, 854 (Fla. 5th DCA 2025). We do not use statutory context "to contradict text or to supplement it" because "the limitations of a text—what the text chooses not to do—are as much a part of its 'purpose' as its affirmative disposition." *Atl. Candy Co.*, 400 So. 3d at 854 (quoting Scalia & Garner, *supra*, at 57). On the merits, the Court's purpose argument is dubious. As we observed in *D.M.T. v. T.M.H.*:

> It is clear that the primary purpose behind the Legislature's enactment of the assisted reproductive technology statute was to ensure that couples taking advantage of medical advances in reproductive science to conceive a child are protected from a claim to parental rights by a third-party provider of the genetic material used for assisted reproductive technology.

129 So. 3d 320, 334 (Fla. 2013). So this case, a claim by a third-party sperm donor like Rivera, may very well have been exactly what the Legislature intended to avoid.

Toward the end of its analysis, the majority briefly conjures, without elaboration, "serious constitutional concerns" about requiring a man to do what the statute says he must if he wants to preserve his paternity rights. In sounding the alarm, it cites cases that could not be more dissimilar to ours, precisely because the men they involved weren't donors at all, but prospective fathers. *See Simmonds v. Perkins*, 247 So. 3d 397, 398-99 (Fla. 2018) (petitioning biological father had a three-year relationship with the mother, they raised the child together, and the child was given his last name); *Kendrick v. Everheart*, 390 So. 2d 53, 55 (Fla. 1980) (biological father of five children born out of wedlock had custody of the children and provided for their support). Unlike the case of a prospective father, a sperm donor like Rivera "relinquishe[s] his rights and claims to any resulting child at the time of his sperm donation by failing to execute a pre-planned adoption agreement." *Enriquez*, 350 So. 3d at 159 (Sasso, J., dissenting).[31]

---

31. To the extent section 742.14 could be attacked on constitutional grounds, a prospective father, and not a sperm donor like Rivera, would have to mount that challenge. It is well-established that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others."

The Court seems bashful about the full import of its reasoning, stopping one step short of what it knows will be an odd result indeed under Florida law: declaring Rivera a child's third legal parent. And that is understandable. Whatever hoops Rivera and other donors in his position will have to jump through, so too will people who have relied on their donations as they await the courts' sorting out of claims that the statute on its face resolves.

I respectfully dissent.

FRANCIS and SASSO, JJ., concur.

Application for Review of the Decision of the District Court of Appeal Certified Direct Conflict of Decisions

   Second District - Case No. 2D2022-4066

   (Hillsborough County)

Eric R. Maier and Frances E. Martinez of Older Lundy Koch & Martino, Tampa, Florida,

   for Petitioner Ashley Brito

Mark A. Neumaier, Tampa, Florida,

   for Petitioner Angel Giovanni Rivera

---

*Woollard v. Gallagher*, 712 F.3d 865, 882 (4th Cir. 2013) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)).

J. Robert Angstadt of Tampa Divorce, Tampa, Florida; and Cristina Alonso of Alonso Appeals, Coral Gables, Florida,

    for Respondent Jennifer Salas

Jennifer A. Patti, Weston, Florida, Matthew E. Thatcher, Tampa, Florida, Christie Lou Mitchell, Orlando, Florida, Jennifer L. Kipke, Gainesville, Florida, Shannon McLin, Orlando, Florida, and Erin Pogue Newell, Fort Lauderdale, Florida,

    for Amicus Curiae Family Law Section Appellate Amicus Committee